

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

IN THE MATTER OF AN APPLICATION )
OF THE UNITED STATES OF AMERICA )
FOR   A   WARRANT   TO   OBTAIN )
RECORDS, LOCATION INFORMATION, )
INCLUDING   PRECISION   LOCATION )     No. 4:17 MJ 5312 NAB
INFORMATION,          CELL          SITE )
INFORMATION,          AND          OTHER )     **FILED UNDER SEAL**
SIGNALING                 INFORMATION )
ASSOCIATED   WITH   THE   CELLULAR )
TELEPHONE HAVING THE NUMBERS )
**(314) 281-0672**.                                      )

## AFFIDAVIT

Christopher M. Grimm, being duly sworn, deposes and says that he is a Special Agent with

the Drug Enforcement Administration, duly appointed according to law and acting as such.

### Introduction

I have been employed with the Drug Enforcement Administration (DEA) since September

2010, and I am currently assigned to an Enforcement Group of the St. Louis Division Office. Prior

to my assignment to the St. Louis Division Office, I was assigned to the Bakersfield Resident

Office in the San Francisco Field Division in California. Prior to my employment with the DEA,

I was a police officer and detective for the St. Louis County Police Department for approximately

six years. During the course of my law enforcement experience I have participated in numerous

investigations involving controlled substances.    I have conducted investigations of a variety of

illegal   drug-trafficking   and   money-laundering   organizations.     I   have   participated   in

investigations which led to the seizure of illegal drugs, weapons, and assets derived from the sale

of   illegal   drugs,   and   the   subsequent   felony   arrests   of   those   individuals   involved.     I   have

participated in numerous drug-related training courses throughout my law enforcement career.   I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of witnesses and defendants, the use of search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources and undercover agents, and the use of court-authorized wire and electronic intercepts. This affidavit is not intended to be a complete and detailed description of all of the facts and evidence discovered during this investigation.

The facts alleged in this affidavit come from my own investigation, my training and experience, and information obtained from other investigators and witnesses.   As this affidavit is submitted for the limited purpose of establishing probable cause to locate and monitor the location of a cellular telephone as part of a criminal investigation, it does not set forth all of the my knowledge regarding this matter.

Upon information and belief, and as explained in greater detail below, the cellular telephone bearing number (**314) 281-0672** (hereinafter the "**subject cellular telephone**"), which is being serviced by SPRINT (hereinafter referred to as "the Service Provider"), has been used, and is presently being used, in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Section(s) 841(a)(1), 846, 843(b) 848 (Continuing Criminal Enterprise), and Title 18 United States Code, Sections(s) 1956 and 1957,  Title 18, United States Code, Section 924(c) and 924 (j) (Possession of a Firearm in Connection to a drug trafficking crime); and, Missouri Revised Statutes Section 565.020 (Murder in the First Degree), Section 565.021 (Murder in the Second Degree), Section 565.023 (Voluntary Manslaughter), Section 565.024 (Involuntary Manslaughter, and Section 571.030(9) (Unlawful Use of Weapons,

2

Discharges or shoots a firearm at or from a motor vehicle)[2]   (hereinafter referred to as "the subject offenses"), by **William REID, AKA Tunuk Grape**, and others known and unknown.

The present affidavit is being submitted in connection with an application of the Government for a warrant and order authorizing agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to obtain location information, including precision location information, cell site location information, and other signaling information, including pen register information, in an effort to locate and monitor the location of the **subject cellular telephone**.

Your affiant further states that there is probable cause to believe that the location information associated with the **subject cellular telephone** will lead to evidence of the aforementioned subject offenses as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

## Investigation and Probable Cause

Beginning in January of 2017, an investigation began into members of 27 Accomac (hereinafter referred to as 27 Mac) and Grape Street Crips Criminal Street Gangs (hereinafter referred to as Grape Street). The investigation began due to an on-going gang feud between the two groups, which has resulted in multiple homicides and assaults. Investigators with the St. Louis Metropolitan Police Department (hereinafter referred to as SLMPD) provided information that the gang feud started over the distribution of heroin in the Fox Park neighborhood. During the course

---

[2]  Recognizing that violations of Missouri state law are not predicate crimes for purposes of the interception of wire and electronic communications, the possibility exists that evidence pertaining to these offenses may be intercepted.

of the investigation, it was determined that both members of 27 Mac and Grape Street were involved in the sale of heroin in the City of St. Louis.

Investigators from SLMPD identified William REID, a documented Grape Street gang member, as being an important, ranking member of the Grape Street Crips.   Review of incident reports, witness interviews, suspect interviews, and conversations with other investigators revealed that REID was trafficking in narcotics, illegally carrying firearms, and a person of interest in at least one shooting and one murder occurring in the City of St. Louis.   A search of REID's criminal history revealed arrests for Possession of a Controlled Substance, Probation Violation, Domestic Assault 2nd, Robbery 1st, Armed Criminal Action, Parole Violation, and Illegal Possession of a Firearm.   REID has been convicted of Possession of a Controlled Substance (State of Missouri Cause Number 0722CR-0845801) and Illegal Possession of a Firearm (State of Missouri Cause Number 1522-CR-0459201).

Investigators are aware that REID provided the **subject cellular telephone** number to officers from SLMPD during an incident on May 23, 2017, documented in SLMPD police report 17-024770. REID also provided **subject cellular telephone** to members of the SLMPD homicide unit as a contact number. I conducted an inquiry of **subject cellular telephone** utilizing the CJIS jail call system, which is utilized by the St. Louis City Department of Corrections. The inquiry revealed that Wesley REID, brother of REID, has contacted the **subject cellular telephone** on multiple occasions beginning January 6, 2017.

### Recent Documented Incidents of Violence Involving REID

As a direct result of this ongoing gang feud, REID was shot on May 23, 2017, at 1525 Choteau, documented in SLMPD original police report number 17-024770.   During this incident,

4

REID directly implicated members of the 27 Mac in the shooting, but refused to provide names of the shooters.    27 Mac member Isaiah CHATMAN was also shot during this incident and refused to cooperate with law enforcement.

REID was also involved in a second shooting on November 27, 2017, in the area of Rutger and Ohio. During this investigation, this area of St. Louis has been determined to be an open-air heroin market. The 27 Mac gang and the Grape Street have an ongoing dispute for control over heroin sales in this area. This dispute has resulted in three shootings, and one attempted drive-by shooting in the area since the beginning of the investigation. One shooting occurred on October 6, 2017; Ebony Cannamore and Stephan Atkinson were shot in the legs by an unknown individual in the back of 2612 Rutger. Open database searches revealed that both Cannamore and Atkinson are associates of Keith MILES, a Grape Street gang member, and REID.   Two of these shootings have involved REID. In addition to the May 23, 2017, incident, on November 27, 2017, REID was shot in the arm and transported himself to a nearby hospital. REID has refused to cooperate with authorities in this incident as well.

### Threats of Violence Against Grape Street by 27 Mac

Beginning in April of 2017, members of this investigative team began conducting controlled purchases of heroin from 27 Mac member Jimmie PAMPKIN, who has also been implicated in several homicides resulting from this gang feud. Investigators obtained authorization to intercept the electronic communications of PAMPKIN's cellular phone with assigned number 314-399-2816 (hereinafter Target Telephone #1)[3] from the Eastern District of Missouri on October 2, 2017.

---

[3] The initial T-III on target telephone #1 began on October 3, 2017, and was terminated on

On October 5, 2017, investigators intercepted an outgoing call from PAMPKIN utilizing Target Telephone #1 to a subject utilizing a cellular telephone assigned number 314-701-9919. During calls between PAMPKIN and 314-701-9919, PAMPKIN refers to the user as "Ali." Based on information provided by the SLMPD gang and intelligence units, 27 Mac gang member Isaiah CHATMAN utilizes the moniker "Ali" and has provided it to law enforcement in the past. The following is a synopsis of a call on October 5, 2017:

CHATMAN:   Hello?

PAMPKIN:   Yeah, what are you asleep?

CHATMAN:   Nah I'm good, I had laid back down for a second but I've been up since early.

PAMPKIN:   Ah yeah. I need you though.

CHATMAN:   What's up?

PAMPKIN:    I need your eyes and shit you hear me?

CHATMAN:   U/I uh-huh.

PAMPKIN:   I said I need your eyes and shit. I got you.

CHATMAN:   What you talking about just let me know.   U/I on dude and them.

PAMPKIN:   This one. Shit all, whoever out there.

CHATMAN:   Oh shit I finna step outside right now.

PAMPKIN:   Just let me know whenever you do it. You heard me?

CHATMAN:   Yeah God damn me, I'mma uh, hit you right, right... I heard some of what happened yesterday man. Some mother fucker was out earlier this morning. Dude, uh, you know that light skinned nigga and shit God damn U/I.   Uh all them something supposed to happen with dude yesterday or

_____

November 2, 2017. A second T-III on target telephone #1 was initiated on November 27, 2017, and is currently on going.

something?

PAMPKIN:     U/I one of them.

CHATMAN:     Yeah.

PAMPKIN:     Nahh.

CHATMAN:     Oh okay.   God damn me, uh, yup, yup and then they had some hoes out there with them you know, talking and shit. Talking about 'why you ain't get the nigga he was punking us and this and that ' and all that old shit. You know it's static, you know dude will come back and whoopty wop and woppty wam.   All this old shit. But yeah dude ain't even been up in, he ain't even been up in the G8 though.

PAMPKIN:     What he been in?

CHATMAN:     Uhh like a white Honda type situation. Like a white, yeah like a white...

PAMPKIN:     You know me I got you. Them niggas just straight killed my partner and shot his son yesterday. On me.

CHATMAN:     Straight up?

PAMPKIN:     Yeah.

CHATMAN:     Yeah he ain't even been, that's why he ain't even been up in, as a matter of

                fact I'm gonna tell you exactly what it is. It ain't even no Honda.

PAMPKIN:     You say take no pictures?

CHATMAN:     Yeah, yeah.

PAMPKIN:     Can you sneak one? Yeah do that for me I straight got you though, you hear me?

CHATMAN:            Alright.

PAMPKIN:     Alright.


**SUMMARY:** Based on this call, investigators believed that when PAMPKIN states, "I

need your eyes and shit you hear me," that PAMPKIN is asking CHATMAN to conduct surveillance for him. CHATMAN responds to PAMPKIN, "Oh okay.  God damn me, uh, yup, yup and then they had some hoes out there with them you known, talking and shit. Talking about 'why you ain't get the nigga he was punking us and this and that ' and all that old shit. You know it's static, you know dude will come back and whoopty wop and woppty wam.   All this old shit. But yeah dude ain't even been up in, he ain't even been up in the G8 though." Based on this call, investigators believe that CHATMAN is describing an individual to PAMPKIN who has been selling heroin in the area of Fox Park and that the individual was not a member of the 27 Mac gang.  Fox Park is the area claimed by the 27 Mac gang as the area where they are known to distribute narcotics. CHATMAN then describes the vehicle the individual that PAMPKIN is requesting information about in the conversation. PAMPKIN also responds to CHATMAN stating, "You know me, I got you. Them niggas just straight killed my partner and shot his son yesterday. On me."   Investigators believed that as PAMPKIN tells CHATMAN that his partner was killed yesterday and his son was shot, that PAMPKIN is referring to Robert WHITE Jr. who was shot and killed in Illinois, on October 4, 2017. WHITE's six-year-old son was in the vehicle and was shot as well. WHITE was a documented 27 Mac member and was in frequent contact with PAMPKIN on target telephone #1.   WHITE was a listed "target subject" in the Title III application for target telephone #1.   Investigators believed that when CHATMAN states, "Yeah God damn me, I'mma uh, hit you right, right... I heard some of what happened yesterday man. Some mother fucker was out earlier this morning. Dude, uh, you know that light skinned nigga and shit God damn [U/I.]   Uh all them something supposed to happen with dude yesterday or something?," that he is indicating that he is aware of WHITE's homicide and that he believes the

8

individual that he describes as "that light skinned nigga" is responsible.   CHATMAN goes on to

ask PAMPKIN, "Uh all them something supposed to happen with dude yesterday or something?,"

that he is asking PAMPKIN if he had planned to retaliate for the death of WHITE.

On October 5, 2017, at approximately 12:23 PM, investigators intercepted an outgoing call

from **target telephone #1** to CHATMAN. The following is a synopsis of the call:

| | |
|---|---|
| CHATMAN: | Hello? |
| PAMPKIN: | Yeah. |
| CHATMAN: | I was just finna text you this picture bro. |
| PAMPKIN: | Alright go ahead. They still out there? |
| JUVENILE #2: | Hold on I finna unlock this shit. |

(Door opens.)

| | |
|---|---|
| CHATMAN: | Well how long is it gonna take for a Goddamn mean motherfucker to come slide up on them motherfucker Goddamn me, you know? Nah I'm just talking shit as I'm walking past them. |
| PAMPKIN: | U/I |
| CHATMAN: | Yeah dude, uh, dudes and 'ook' and a couple other little niggas is out there.   U/I... got on a red shirt and some little blue shorts and shit.   He be and like I say he was talking all shit this morning you hear me? |
| PAMPKIN: | Yeah. |
| CHATMAN: | Yeah was talking all shit on some shit like "If I get dealt with I get dealt with fuck them niggas, what, what, what."  He was talking like that. But I ain't know what had took place you feel me? |
| PAMPKIN: | Yeah.  U/I |
| CHATMAN: | Yeah, Goddamn motherfuckers still out there. Dude 'Slick' gone though. |

PAMPKIN:        What he using there a little Jeep?

CHATMAN:        Nah he been switching up on an every type day basis. He been in and out. I think he slid out in a Magnum bro.

PAMPKIN:        You don't know what color it was?

CHATMAN:        It was like uh, uh brownish-gray. You know that brownish-gray Magnum type shit?

PAMPKIN:        Yeah.

CHATMAN:        Yeah I think he slid out in that?   Cuz the Jeep still here but he gone.

PAMPKIN:        Ahh yeah.

CHATMAN:        And Goddamn me, it ain't no real real good good ass picture but I'm just giving you an idea of what we looking at, at that white Honda you hear me?   What you call, he just ain't been in that, uh, that that G8 for the past like, I wanna say for the past like five, six days.   He ain't been in that motherfucker.

PAMPKIN:        Yeah cuz he know that people know that he in that motherfucker so he probably ain't finna trying to be driving that bitch.

CHATMAN:        Mmm hmm he was talking about swapping it in.

PAMPKIN:        Mmmm.

CHATMAN:        Mmmm hmmm.

PAMPKIN:        Did he hollar that you were sitting there?

CHATMAN:        Yeah on my mama. Motherfucker pulled up like maybe, I wanna say a week or so ago, little over a week. Yeah he pulled up like 'You fuck around, don't you? I'm like yeah what's up   He throw a shoe of Fenny at me and a shoe of some regular shit 'like man tell me what's up with it' you hear me?

PAMPKIN:        Yeah.

CHATMAN:        So God damn I called him a few times the other day and he was plugging U/I you hear me?

PAMPKIN:           Yeah.

CHATMAN:           God damn me I ain't hollared at him in maybe three, four days. This morning when I walked by he wanna make a show and shit. Hey uh, 'What you trying to do?'  You hear me, in front of some hoes and all that ole shit, you feel me?

PAMPKIN:           Damn motherfucker got U/I.

CHATMAN:           Yeah, yeah, yeah.

          (Talking over each other.)

CHATMAN:           I say this motherfucker making shit God damn me high maintenance shit and U/I shit.

PAMPKIN:           Yeah.

CHATMAN:           Yeah.

PAMPKIN:           U/I

CHATMAN:                     Huh?

PAMPKIN:           Nah, I was talking to my partner.   Yeah nah but I finna call you though. I finna leave out though.

CHATMAN:           Alright.

**SUMMARY**: Investigators believed that when CHATMAN states, "I was just finna text you this picture bro," that he is indicating to PAMPKIN that he is going to take a photo of the individuals that are selling narcotics in the 27 Mac gang's area. At this point, CHATMAN can be heard on the interception opening the door, presumably to take the photo. Interceptions indicated that a photo was sent but T-Mobile was unable to provide the photo to investigators.  CHATMAN then tells PAMPKIN, "Well how long is it gonna take for a Goddamn mean motherfucker to come slide up on them motherfucker God damn me, you know?  Nah I'm just talking shit as I'm walking past them.  Yeah dude, uh, dudes and 'Ook' and a couple other little niggas is out there.  U/I... got

11

on a red shirt and some little blue shorts and shit.   He be and like I say he was talking all shit this morning you hear me?" Investigators believe that CHATMAN is indicating to PAMPKIN that PAMPKIN needs to come to the area in order to confront the individuals that CHATMAN describes in the call. Investigators also believe that when CHATMAN states that "Ook" is in the area selling fentanyl that CHATMAN is referring to REID who goes by the moniker "Tunuk." Investigators have observed on Facebook videos fellow Grape Street members refer to REID as "Nook" as a shorthand.  Investigators also believe that when CHATMAN refers to a "mean motherfucker to come slide up on them motherfucker God damn me, you know," that he is indicating that PAMPKIN is going to commit an act of violence on the individuals.

Based on the above-mentioned call and the information provided from St. Louis City Police Department regarding the ongoing dispute between Grape Street and 27 Mac gangs, investigators believed that CHATMAN and PAMPKIN were coordinating to conduct a drive-by shooting of the individuals that CHATMAN had identified in the intercepted calls. Investigators obtained emergency authorization to obtain precision location information on CHATMAN's cellular device and observed that he was located in an apartment in immediate proximity to Rutger and Ohio and the area were the Grape Street gang hang out. Investigators subsequently obtained a court ordered PLW for 314-701-9919 on October 6, 2017, signed by The Honorable Shirley P. Mensah in the Eastern District of Missouri.

Based on these calls, investigators conducted surveillance of PAMPKIN and observed PAMPKIN and three other members of the 27 Mac gang enter into a vehicle and travel directly to the Rutger and Ohio area just prior to fleeing from law enforcement. Subsequent intercepted calls between CHATMAN and PAMPKIN indicated that PAMPKIN and the other members of the 27

Mac gang that were in the vehicle under surveillance were armed with "handguns" and "rifles."

### Arrest of BRISON

Based on these incidents, investigators began conducting surveillance of the Rutger and Ohio area and the heroin distribution by Grape Street gang members. During the week of October 30, 2017, members of this investigative team conducted surveillance of the area an individual later identified as Joshua BRISON, an associate of MILES, was observed meeting with an individual in a Chrysler 200. During this surveillance, TFO Eric Lanham observed the occupant of a grey Chrysler 200 conduct what investigators believed to be a narcotics transaction in the rear of 2666 Rutgers.[4]   Investigators followed the Chrysler 200 to the parking lot of a Shop N Save located at 4660 Chippewa where investigators observed BRISON in the vehicle. St. Louis City Police Department detectives approached the vehicle and contacted BRISON. At this time, St. Louis City Police Detective Mike Betz observed a handgun (later determined to by a .40 caliber Glock 27 loaded with one magazine containing 15 rounds) in plain sight on the floorboard near BRISON's feet. BRISON was asked to exit the vehicle so that further investigation could be conducted. BRISON advised investigators that he was currently on parole for Robbery 2nd degree and Armed Criminal Action and had been sentenced to ten years on the Missouri Department of Corrections. At this time, BRISON was arrested for felon in possession of a firearm. In a search incident to arrest, investigators discovered what appeared to be a quantity of heroin in BRISON's front left pocket.

---

[4] This narcotics transaction took place near where the shooting of Ebony Cannamore and Stephan Atkinson took place on October 6, 2017.

13

In a post arrest interview, BRISON, in an effort to gain consideration regarding this arrest, advised officers that he/she was aware of a subject only identified as "Tunuk" who was illegally carrying a firearm.    When investigators advised the arrested subject that they could not make any promises or agreements regarding their prosecution, BRISON refused to provide any information.    Investigators later learned that REID was operating the same Chrysler 200 when REID was shot on November 27, 2017, that BRISON was occupying when he was arrested. Based on this ongoing investigation, I know "Tunuk" to be the street name for REID, and believe that BRISON was identifying REID as illegally carrying a firearm.

### Arrest of MILES

On November 8, 2017, members of the SLMPD and DEA arrested Keith MILES, a Grape Street gang member, as part of this investigation. During his arrest, MILES was in possession of several ounces of a heroin and fentanyl mixture and a stolen handgun. Later, investigators also seized approximately ten (10) thousand dollars in cash belonging to MILES. During a post arrest interview, MILES indicated to investigators that fellow members of Grape Street distribute heroin from the parking lot on which investigators had been conducting surveillance.    MILES advised investigators that Grape Street members would hide heroin in the dryer vents of the apartment units located around the parking lot near Rutger and Ohio.   MILES also indicated that Grape Street gang members also carry firearms for protection from rival gang members.

Following his arrest, MILES, was transported to the St. Charles County Jail. Investigators have been monitoring calls that MILES has made from jail as part of this investigation.   Inmates are told that phone calls are monitored and recorded.   On November 11, 2017, at 16:23 hours, MILES contacted phone number (314) 265-9756. MILES engaged a female, Khirsten Crawford,

in general conversation. During the conversation, MILES asked Crawford to contact "Tunuk**,"** REID's street name. Investigators also observed that during this call Crawford was conducting a live video chat with MILES when he requested that she contact REID.   Investigators watched the recorded video chat as Crawford picked up her phone and contacted REID. Investigators observed Crawford turn the phone to face the camera on the laptop and investigators could see that REID was on the phone screen in a live video transmission. Investigators then watched as MILES and REID communicated over the video feeds.   Crawford contacted REID on the **subject cellular telephone**, as verified through an analysis of Crawford's cellular phone tolls.   REID and MILES then engaged in a conversation wherein MILES informed REID that agents of the Government are targeting REID and other members of Grape Street. During the call MILES makes the following statements to REID:

| | |
|---|---|
| REID: | Shit what you on man? |
| MILES: | Shit, I'm in Federal Custody. |
| REID: | He talking, 'Shit, I'm in Federal Custody' I don't need your bitch ass being smart and shit man. |
| MILES: | [Laughs] |
| REID: | Damn, cuz, I'm pissed off cuz, I definitely am cuz, I'm gonna give this shit up man. |
| MILES: | Please do, Cuz, 'cause they on you ass my nigga. |
| REID: | On Mine? |
| MILES: | On my momma. |
| REID: | For what? |
| MILES: | Shit, why you … Boy for real though, I'm letting you know, I ain't gonna say too much bro, but shit you was like the main topic bro. |

15

REID:        So what you say they gonna come get me?

MILES:      Yeah they gonna come get everybody who they can get nigga.

REID:        So what you think it got something …

MILES:      It got something to do with the hood bro.

REID:        So what as long as I stay away from the here I'm good or what?

MILES:      Yeah, stay away, stay away don't be on shit bro.

REID:        You say what?

MILES:      Go on and take your talents somewhere else man.

SUMMARY:    Investigators believe that the based on this context of this call and the investigation, while REID and MILES discuss "giv[ing] this shit up" it refers to their gang activity and specifically carrying of firearms illegally and selling illicit narcotics.  Further, I believe that the "talents" MILES are referring to are REID's illicit narcotics sales in the area of Rutgers and Ohio. Based on this call, investigators believe that REID will move his heroin sales  from this area after the warning from MILES.  Investigators also believe that REID will continue to sell heroin. Investigators base this on the fact that REID has no identifiable source of legitimate income and during surveillance has never been observed travelling to or engaging in any employment activity. Investigator also believe that REID is still trafficking heroin based on the fact that following this call, REID was again shot on November 27, 2017, in a continuation of the dispute over heroin sales between the 27 Mac and Grape Street Crips.

### Facebook Video of Rutger and Ohio Area

On November 22, 2017, investigators were contacted by Tom Mauzy, Criminal Investigator/Lead Intelligence Analyst for the St. Louis Circuit Attorney's Office.  Investigator

Mauzy indicated that he had observed a Facebook video posted on October 5, 2017, to a page assigned the named Sashay Rose.   Investigators viewed the video and observed MILES operating a vehicle. Investigators observed that MILES drives the vehicle into the area of Rutger and Ohio, which has been under surveillance. Investigators observed REID approach the vehicle and MILES slide a handgun from his lap to the center counsel of the vehicle. Investigators also observe on the video a second unidentified black male subject speaking on a small flip phone. Investigators know that narcotics traffickers often will use multiple phones or switch phones often to avoid detection from law enforcement. Because of these frequent uses and the expensive prices associated with smart phones, many narcotics traffickers will utilize cheaper flip phones that can be purchased frequently or in larger quantities.   Investigators observed the male speaking on the phone directing the individual on the line to his location. The video shows a vehicle arrive and the man approach the driver side window of an unknown vehicle operated by an unknown individual vehicle. At this time, the video pans away from the male.

Based on this incident, surveillance of the area, interviews of arrested Grape Street Crip members, and the seizure of heroin, investigators believe that this area is the open area narcotics trafficking market, and that members of the Grape Street Crip utilize the area to distribute heroin. Investigators also believe that REID is distributing narcotics from this area as well and is utilizing **subject cellular telephone** to do so.

### Surveillance at Rutger and Ohio

On several occasions, investigators have observed REID frequenting the area of Rutger and Ohio. This area has been established as the primary open air heroin market operated by members of the Grape Street Crips. Investigators have observed on numerous surveillances several

17

members of the gang congregating in a parking lot at this intersection. Investigators have also made consensual contacts with individuals as they left this area after making contact with unidentified males and subsequently seized heroin from these individuals.   Investigators have observed REID hanging out in this area and making short trips to a nearby gas station to meet with an individual for short periods of time. This behavior is consistent with the distribution of street level narcotics.

<u>**Toll Analysis of the Subject Cellular Telephone**</u>

Toll analysis of **subject cellular telephone** during these surveillances (described in the section immediately above) has indicated numerous incoming and outgoing calls to the **subject cellular telephone.** The calls are of short durations.   Investigators know that this type of contact, namely multiple contacts of a short duration between **subject cellular telephone** and the same number in a short time span, followed by a short trip by **REID** to meet someone, is indicative of the pattern associated with street level narcotics sales. Investigators know that street level narcotics traffickers will often have to field multiple calls from customers during which customers will negotiate prices, meeting locations, and their current estimated time of arrival. Based on the tolls analysis of **subject cellular telephone,** interviews of fellow Grape Street Crip members, surveillances, arrests, and intercepted calls, investigators believe that REID is utilizing the **subject cellular telephone** to distribute heroin in the Rutger and Ohio area. Investigators have continued to conduct consistent tolls analysis of **subject cellular telephone** obtaining toll information beginning on October 16, 2017, through November 29, 2017. During this time period, investigators observed that REID had approximately 675 outgoing telephonic contacts of less than 30 seconds duration and 1149 incoming telephonic contacts of less than 30 seconds on **subject cellular**

**telephone**.

Obtaining the precision location information for **subject cellular telephone** would assist investigators in locating **REID** and assist in the ongoing investigation into his illicit narcotics sales.

The investigation has clearly demonstrated that the **subject cellular telephone** is being used in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Section(s) 841(a)(1), 846, 843(b) 848 (Continuing Criminal Enterprise), and Title 18 United States Code, Sections(s) 1956 and 1957,  Title 18, United States Code, Section 924(c) and 924 (j) (Possession of a Firearm in Connection to a drug trafficking crime); and, Missouri Revised Statutes Section 565.020 (Murder in the First Degree), Section 565.021 (Murder in the Second Degree), Section 565.023 (Voluntary Manslaughter), Section 565.024 (Involuntary Manslaughter, and Section 571.030(9) (Unlawful Use of Weapons, Discharges or shoots a firearm at or from a motor vehicle) (the subject offenses).    It is critical that the investigative team be able to locate and monitor the movements of the **subject cellular telephone** thereby assisting in the identification of the co-conspirators and the seizure of narcotics. Your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation.

## Investigative Considerations and Techniques

Based on my knowledge, training, and experience, as well as information provided by investigators with specialized experience relating to cellular telephone technology, I am aware of the following facts and considerations:

A.      Wireless phone providers typically generate and retain certain transactional information about the use of each telephone call, voicemail, and text message on their system. Such information can include log files and messaging logs showing all activity on a particular account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or other addressing information associated with particular telephone calls, voicemail messages, and text or multimedia messages.

B.      Wireless phone providers also typically generate and retain information about the location in which a particular communication was transmitted or received.   For example, when a cellular device is used to make or receive a call, text message or other communication, the wireless phone provider will typically generate and maintain a record of which cell tower(s) was/were used to process that contact.   Wireless providers maintain information, including the corresponding cell towers (i.e., tower covering specific geographic areas), sectors (i.e., faces of the towers), and other signaling data as part of their regularly conducted business activities.   Typically, wireless providers maintain records of the cell tower information associated with the beginning and end of a call.

C.     Because cellular devices generally attempt to communicate with the closest cell tower available, cell site location information from a wireless phone provider allows investigators to identify an approximate geographic location from which a communication with a particular cellular device originated or was received.

D.     Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it.  Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers.

E.     Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscriber's full name and address, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscriber's Social Security Number and date of birth, all

21

telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscriber.   In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed).   The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

F.      Providers of cellular telephone service also typically have technical capabilities that allow them to collect and generate more precise location information than that provided by cell site location records.   This information is sometimes referred to as E-911 phase II data, GPS data or latitude-longitude data.   In the Eastern District of Missouri, such information is often referred to as "precision location information" or "PLI" data.   E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by attempting to triangulate the device's signal using data from several of the provider's cell towers.   Depending on the capabilities of the particular phone and provider, E-911 data can sometimes provide precise information related to the location of a cellular device.

In order to locate the **subject cellular telephone** and monitor the movements of the phone, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may need to employ one or more techniques described in this affidavit and in the application of the government.   The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may seek a warrant to compel the Service Provider, any telecommunication service providers reflected in Attachment 1, to include providers of any type of wire and/or electronic communications    (herein incorporated by reference), and any other applicable service

22

providers, to provide precision location information, including Global Position System information (if available), transactional records, including cell site location information, and pen register and trap-and-trace data.

None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass. Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only.   Furthermore, the criminal conduct being investigated is not limited to the daytime.   Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of the requested investigative techniques to daytime use only.   Accordingly, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

The monitoring of the location of the **subject cellular telephone** by one of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

## Conclusion

Based on the above information, there is probable cause to believe that the **subject cellular telephone** is being used to promote and facilitate a conspiracy to distribute narcotics and the requested authorization would provide relevant evidence of the conspiracy.   There is likewise probable cause to conclude that locating and monitoring the movements of the **subject cellular telephone** will lead to the relevant evidence concerning violations of Title 21, United States Code, Section(s) 841(a)(1), 846, 843(b) 848 (Continuing Criminal Enterprise), and Title 18 United States Code, Sections(s) 1956 and 1957,   Title 18, United States Code, Section 924(c) and 924 (j) (Possession of a Firearm in Connection to a drug trafficking crime); and, Missouri Revised Statutes Section 565.020 (Murder in the First Degree), Section 565.021 (Murder in the Second Degree), Section 565.023 (Voluntary Manslaughter), Section 565.024 (Involuntary Manslaughter, and Section 571.030(9) (Unlawful Use of Weapons, Discharges or shoots a firearm at or from a motor vehicle.

12/1/2017
_____
DATE

_____
Christopher M. Grimm
Special Agent
Drug Enforcement Administration


Sworn to and subscribed before me this   1st   day of December, 2017.

_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

## LIST OF TELECOMMUNICATION SERVICE PROVIDERS

SPRINT

and

| | | | |
|---|---|---|---|
| 01 Communications | Empire Paging | MCI Worldcom | Smart Beep Paging |
| Access Line Communication | Ernest Communications | Metro PCS | Smart City Telecom |
| ACN Communications | Echelon Telecommunications | Metro Teleconnect | Socket Telecom |
| ACS | EZ Talk Communications | Mid-Atlantic | South Central Bell |
| Aero Communications, Inc. (IL) | FDN Communications | Midvale Telephone Exchange | Sprint |
| Afford A Phone | Fibernit Comm | Midwest Wireless | Sprint Spectrum, L.P. |
| Airvoice Wireless | Florida Cell Service | Millington Telephone | SRT Wireless |
| Alaska Communications | Florida Digital Network | MLM Telecommunications | Star Telephone Company |
| Alhambra-Grantfx Telephone | Focal Communications | Mobile Communications | Start Wireless |
| AmeriTel | Frontier Communications | Mound Bayou Telephone Co. | Sugar Land Telephone |
| AOL Corp. | Gabriel Comm | Mountain Bell | Sure West Telephone Company |
| Arch Communication | Galaxy Paging | Mpower Communictions | Talk America |
| AT&T | Global Communications | Navigator | Tele Touch Comm |
| AT&T Mobility | Global Crossing | Telecommunications | Telecorp Comm |
| Bell Aliant | Global Eyes Communications | NE Nebraska Telephone | Telepak |
| Big River Telephone | Global Naps | Netlink Comm | Telistire |
| Birch Telecom | Global Rock Network | Network Services | Telnet Worldwide |
| Blackberry Corporation | Grafton Telephone Company | Neustar | Tex-Link Comm |
| Brivia Communications | Grand River | Neutral Tandem | Time Warner Cable |
| Broadview Networks | Grande Comm | Nex-Tech/United Wireless | T-Mobile |
| Broadvox Ltd. | Great Plains Telephone | Nexus Communications | Total Call International |
| Budget Prepay | Harrington Telephone | NII Comm | Tracfone Wireless |
| Bulls Eye Telecom | Harrisonville Telephone Co. | North Central Telephone | Trinity International |
| Cable Vision | Heartland Communications | North State Comm | Triton PCS Company |
| Call Wave | Hickory Telephone | Northcoast Communications | U-Mobile |
| Cbeyond Inc. | Houston Cellular Telephone | Novacom | Unicel Cellular |
| CCPR Services | Huxley Communications | Ntera | United On-Line |
| Cellco Partnership, | iBasis | N-Teleos Wireless | United States Cellular Corp. |
| d/b/a Verizon Wireless | IDT Corporation | NTS Communications | United Telephone of MO |
| Cellular One | Illinois Consolidated | Oklahoma City SMSA | US Cellular |
| Cellular South | Communications | ONSTAR | US Communications |
| Centennial Wireless | Illinois Valley Cellular | Optel Texas Telecom | US LEC |
| CenturyLink | Insight Phone | Orion Electronics | US Link |
| Champaign Cellular | Integra | PacBell | US West Communcations |
| Charter Communications | Iowa Wireless | PacWest Telecom | USA Mobility |
| Chickasaw Telephone | IQ Telecom | PAETEC Communications | VarTec Telecommunications |
| Choctaw Telephone Company | J2 Global Communications | Page Plus Communications | Verisign |
| Choice Net Comm. | Leap Wireless International | Page Mart, Inc. | Verizon Telephone Company |
| Cimco Comm | Level 3 Communications | Page Net Paging | Verizon Wireless |
| Cincinnati Bell | Level One | Panhandle Telephone | Viaero Wireless |
| Cinergy Communications | Local Links Communications | Peerless Network | Virgin Mobile |
| Citizens Utilities | Locus Communications | Pineland Telephone | Vonage Holdings |
| Clear World Communication | Logix Communications | PhoneTech | Wabash Telephone |
| Com-Cast Cable Comm. | Longlines Wireless | PhoneTel | Weblink Wireless |
| Comm South Companies | Los Angeles Cellular | Preferred Telephone | Western Wireless |
| Commercial Communications | Madison River | Priority Communications | Westlink Communications |
| Consolidated Communications | Communications | Puretalk | Windstream Communications |
| Conversent Communications | Madison/Macoupin Telephone | RCN Telecom | WinStar Communications |
| Cox Communications | Company | RNK Telecom | Wirefly |
| Cricket Wireless | Mankato Citizens Telephone | QWEST Communications | WISPNET, LLC |
| Custer Telephone Cooperative | Map Mobile Comm | Sage Telecom | World Comm |
| DBS Communications | Marathon Comm | SE All-Tel Comm | XO Communications |
| Delta Communications | Mark Twain Rural | Seren Innovations | Xspedius |
| Detroit Cellular | Matrix Telecom, Inc. | Sigecom LLC | Yakdin Valley Telephone |
| Dobson Cellular | Max-Tel Communications | Sky Tel Paging | YMAX Communications |
| Egyptian Telephone | McCleod USA | | Ztel Communications |
| Electric Lightwave, Inc. | | | |

**ATTACHMENT 1, TO INCLUDE PROVIDERS OF ANY TYPE OF WIRE AND/OR ELECTRONIC COMMUNICATIONS**          Last Update: 11/14/2017